UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JAMAAR C. BESS, | ) |
|                 *Plaintiff*, | ) |
|                 vs. | ) No. 2:23-cv-00420-JMS-MJD |
| CENTURION HEALTH OF INDIANA, LLC and SAMUEL BYRD, *Dr.*, | ) |
|                 *Defendants*. | ) |

**ORDER**

Plaintiff Jamaar Bess was an inmate incarcerated at the Wabash Valley Correctional Facility ("WVCF") during the events underlying this litigation.[1] He filed this lawsuit alleging that Defendants Centurion Health of Indiana, LLC ("Centurion") and Dr. Samuel Byrd violated his constitutional rights by acting with deliberate indifference toward his medical needs after he suffered a knee injury while playing basketball. Mr. Bess asserts an Eighth Amendment claim against all Defendants.[2] Defendants filed a Joint Motion for Summary Judgment. [Filing No. 37.] After Defendants' Motion became ripe, Mr. Bess filed a Motion to Appoint Counsel. [Filing No. 53.]

For the reasons below, Defendants' Joint Motion for Summary Judgment is **GRANTED**, [Filing No. 37], and Mr. Bess's Motion to Appoint Counsel is **DENIED**, [Filing No. 53].

---

[1] Mr. Bess is currently incarcerated at the Putnamville Correctional Facility.

[2] These are the claims which the Court found should proceed after the Court screened Mr. Bess' Complaint pursuant to 28 U.S.C. § 1915A(a), (c). [Filing No. 1; Filing No. 9.]

1

# I.
## DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

### A.     Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up). "Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the nonmoving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### B. Factual Background

The facts stated below are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

#### 1. Mr. Bess's Prior Knee Injury

Mr. Bess suffered an injury to his right Anterior Cruciate Ligament ("ACL") and meniscus in 2012 and 2013 that led to surgical reconstruction. [Filing No. 39-1 at 1; *see* Filing No. 39-3 at 44.] Following reconstructive surgery, Mr. Bess had some degree of ongoing pain and instability and was provided a knee brace. [Filing No. 39-1 at 1.]

#### 2. Mr. Bess's Knee Injury at WVCF

On August 11, 2020, while Mr. Bess was incarcerated at WVCF, he was assessed by Nurse Taylor Hill after a basketball injury where his right knee gave out. [Filing No. 39-3 at 43-45.] Mr. Bess was able to walk "to the infirmary without difficulty from the north side" of the facility and get on the exam table without difficulty, but he had difficulty getting off the exam table and stated that he could not put weight on his right leg. [Filing No. 39-3 at 45.] Nurse Taylor gave Mr. Bess Tylenol and instructed him to rest, use ice/cool compresses, and elevate his right leg. [Filing No. 39-3 at 45.] Mr. Bess informed Nurse Taylor that he did not like wearing his knee brace and did not have it on. [Filing No. 39-3 at 45.] He explained that he had received surgery on his knee previously and requested to see a doctor. [Filing No. 39-3 at 45.] Nurse Hill "informed him to put in [a Health Care Request Form] if [his symptoms] persist or worsen." [Filing No. 39-3 at 45.]

    3.  *Dr. Byrd Orders X-Rays*

On August 13, 2020, Mr. Bess was assessed by Nurse Chantell Knepp after reporting pain in his knee from his injury just two days prior. [Filing No. 39-3 at 47-49.] Nurse Knepp noted that Mr. Bess had "significant swelling and fluid" on his right knee and was able to bear weight but could not fully extend or flex his knee. [Filing No. 39-3 at 49.] Nurse Knepp contacted a doctor for same day treatment. [Filing No. 39-3 at 49.] Later that day, Dr. Byrd issued an order for three x-rays of Mr. Bess's right knee. [Filing No. 39-3 at 46.]

    4.  *Results of the X-Rays*

Mr. Bess received x-rays on August 17, 2020. [Filing No. 39-3 at 1.] Dr. Robert Mehl, an outside provider, took and reviewed the x-rays and issued a radiology report, stating that no fracture or dislocation was visible, that there was "[n]o acute bony abnormality," that postoperative changes of Mr. Bess's ACL surgery were present, and that there were mild degenerative changes of Mr. Bess's knee. [Filing No. 39-3 at 1.]

"An x-ray will not typically reveal a torn ligament, such as an ACL or MCL. However, an x-ray can be beneficial, because it can note significant pockets of swelling, fractures, dislocations, or other abnormalities that may be indicative of a potential ligament tear." [Filing No. 39-1 at 2-3.] Dr. Byrd reviewed the x-ray results and concluded that the results "revealed that it was more than likely that Mr. Bess did not have an acute tear, as the radiologist was able to note the existence of the prior reconstruction. Instead, the results, along with notations that Mr. Bess was able to walk shortly after his injury, were more indicative of a strain or sprain. Likely caused by a hyperextension during a game of basketball." [Filing No. 39-1 at 3.]

On August 19, 2020, Mr. Bess met with Nurse Juanita Chattin to discuss the results of his x-rays. [Filing No. 39-3 at 50.] Nurse Chattin noted that Mr. Bess expressed understanding as to

4

the x-rays results, had no questions or concerns at that time, and was prescribed Naproxen 500 mg. [Filing No. 39-3 at 50.]

        5.     *Mr. Bess's Knee Pain Continues and Dr. Byrd Orders a Localized Knee Injection and a Prescription Steroid*

On October 13, 2020, Mr. Bess saw Dr. Byrd for a chronic care visit regarding Mr. Bess's chronic hypertension, during which Mr. Bess reported continued pain in his right knee. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] Mr. Bess informed Dr. Byrd of the basketball injury on August 11, 2020, noting he experienced immediate pain and swelling. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] Mr. Bess reported that his pain had increased since the injury but that the swelling had resolved. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] He also reported decreased knee stability, a sensation of grinding and popping in the knee, but no catching or instances where his knee completely gave out. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] He requested an ACL brace for his right knee, explaining that his last brace was ineffective. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] Dr. Byrd discussed the potential of a localized knee injection to address his pain. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] Dr. Byrd ordered a knee injection for Mr. Bess and instructed staff to look into the potential of providing a right knee brace. [Filing No. 39-1 at 3; Filing No. 39-3 at 54-56.] Any brace provided to patients at WVCF required approval from security staff. [Filing No. 39-1 at 3-4.] Dr. Byrd also ordered a nine-day prescription of the steroid Prednisone. [Filing No. 39-1 at 4; Filing No. 39-3 at 56.]

        6.     *Mr. Bess Receives the Localized Knee Injection and More Steroids*

On January 29, 2021, Mr. Bess received the localized knee injection from Dr. Byrd. [Filing No. 39-1 at 4; Filing No. 39-3 at 57.] On February 5, 2021, Dr. Byrd saw Mr. Bess for a regularly scheduled chronic care visit, where they discussed Mr. Bess's chronic health issues and his knee. [Filing No. 39-1 at 4.] Dr. Byrd told Mr. Bess that medical "staff had difficulty obtaining any

5

approval from custody staff for a brace with metal or plastic, due to their security concerns." [Filing No. 39-1 at 4; Filing No. 39-3 at 58.] Mr. Bess obtained some relief from the localized knee injection but did not have interest in receiving another. [Filing No. 39-2 at 6 (Mr. Bess's testimony that he received relief from the injection); Filing No. 39-3 at 58.] Dr. Byrd prescribed Prednisone in a short course and scheduled a follow up. [Filing No. 39-3 at 58.]

      7.  *Mr. Bess Receives Prescription Pain Medication and Physical Therapy*

On April 1, 2021, Dr. Byrd prescribed Cymbalta for Mr. Bess's pain, which is a medication approved for management of chronic pain. [Filing No. 39-1 at 5.] On April 11, 2021, Mr. Bess was seen again by nursing staff after reporting knee pain. [Filing No. 39-1 at 5; Filing No. 39-3 at 66-68.] He requested further treatment "such as a MRI," and the nurse left a note for Dr. Byrd. [Filing No. 39-1 at 5; Filing No. 39-3 at 66-68.] Dr. Byrd reviewed the nurse's note and ordered onsite physical therapy for Mr. Bess. [Filing No. 39-1 at 5; Filing No. 39-3 at 69-72.] Dr. Byrd believed that "physical therapy may provide Mr. Bess with stretching and strengthening exercises that could provide increased stability and decrease [his knee] symptoms." [Filing No. 39-1 at 5.]

Mr. Bess had five physical therapy visits between April 13, 2021 and June 1, 2021. [Filing No. 39-3 at 73-89.] By June 1, 2021 when Mr. Bess was discharged from physical therapy, the physical therapist noted that he was "doing well," had full range of motion, had good muscle strength, could "ambulate with a stable gait without limping," was "functionally independent," was issued arch supports for his feet to aid in knee pain, and was given instructions and exercises to continue performing on his own. [Filing No. 39-3 at 87-89.]

      8.  *Mr. Bess's Pain Continues*

Mr. Bess was seen by a nurse for reports of knee pain and swelling on June 18, 2021, August 5, 2021, and September 8, 2021. [Filing No. 39-3 at 3-8; Filing No. 39-3 at 95-97.] Mr.

Bess was provided with knee exercises and chronic pain education and was advised to use Ibuprofen if needed. [*See* Filing No. 39-3 at 3-8; Filing No. 39-3 at 95-97.] There was no swelling on two of the visits, and mild swelling on the third. [Filing No. 39-3 at 3-8; Filing No. 39-3 at 95-97.]

        9.    *Dr. Byrd Orders Additional Physical Therapy*

On September 13, 2021, Dr. Byrd saw Mr. Bess and the two reviewed Mr. Bess's symptoms. [Filing No. 39-3 at 9-11.] Mr. Bess was still experiencing pain and was concerned with a sensation of instability while running and working out. [Filing No. 39-3 at 9-11.] Dr. Byrd provided education on the structure of the knee and quad strengthening and ordered additional physical therapy. [Filing No. 39-3 at 9-11.]

        10.    *Mr. Bess's Pain Continues and He Receives Additional X-Rays and a Knee Sleeve*

Mr. Bess attended several additional nurse visits, complaining of knee pain and sometimes swelling and had requested to switch to Keppra for his pain management. [Filing No. 39-3 at 12-25.] Dr. Byrd approved the switch to Keppra, and a nurse dispensed an ACE bandage to Mr. Bess. [Filing No. 39-3 at 12-25.]

On November 17, 2022, Mr. Bess was seen for a chronic care visit with Nurse Crawford. [Filing No. 39-3 at 28-30.] Mr. Bess discussed his continued knee pain, and Nurse Crawford instructed Mr. Bess to continue taking Keppra and to begin using Voltaren gel to help with inflammation, and ordered additional x-rays. [Filing No. 39-3 at 28-30.] Mr. Bess received x-rays the next day, and Dr. Mehl noted that there was "[n]o acute bony abnormality of the right knee," there was "[r]emote ACL reconstruction without acute complication," and there were "[d]egenerative changes [to the] medical and lateral femorotibial compartments." [Filing No. 39-3 at 98.] Mr. Bess received a knee sleeve on December 17, 2022. [Filing No. 39-3 at 31.]

11.  *Mr. Bess's Pain Continues and He Receives an Ultrasound*

On April 11, 2023, Dr. Byrd saw Mr. Bess and examined his right leg, which revealed that his right calf muscle had atrophied "consistent with decreased use." [Filing No. 39-1 at 9; Filing No. 39-3 at 32-34.] Dr. Byrd submitted an outpatient request for Mr. Bess to receive an ultrasound to evaluate the ligaments in Mr. Bess's right knee. [Filing No. 39-3 at 32-34.]

Mr. Bess received the ultrasound on August 1, 2023. [Filing No. 39-3 at 2.] Dr. Byrd is "not aware of the reason why he was scheduled almost four months after [he] submitted [the] request." [Filing No. 39-1 at 9.] Dr. Mehl's review of the ultrasound revealed no evidence of full-thickness musculotendinous or ligamentous tear and no evidence of abnormal fluid collection, hematoma or other abnormality. [Filing No. 39-3 at 2.]

12.  *This Lawsuit*

Mr. Bess filed his *pro se* Complaint on August 16, 2023. [Filing No. 1.] The Court screened Mr. Bess's Complaint pursuant to 28 U.S.C. § 1915A, and found that he stated an Eighth Amendment claim via 42 U.S.C. § 1983 against both Centurion and Dr. Byrd. [Filing No. 9.] Mr. Bess alleges that Centurion and Dr. Byrd were deliberately indifferent toward his medical needs by failing to provide him with adequate medical care for his right knee. [Filing No. 1 at 3.] Specifically, Mr. Bess is suing Dr. Byrd because he believes that he required an MRI and to be seen by an outside doctor for further investigation, and he is suing Centurion because Centurion employs Dr. Byrd and should be responsible for Dr. Byrd's actions. [Filing No. 39-2 at 4; Filing No. 39-2 at 9.] Defendants have filed a Joint Motion for Summary Judgment. [Filing No. 37.]

13.  *Additional Nurse Visits and Treatment*

On November 7, 2023, Mr. Bess saw Nurse Crawford for a chronic care visit, during which he complained of knee pain. [Filing No. 39-3 at 35-37.] Mr. Bess's dose of Keppra was increased

8

and he was encouraged to exercise and stretch his knee daily and to wear his brace whenever he was walking. [Filing No. 39-3 at 35-37.] Mr. Bess was assessed by Nurse Willis on December 8, 2023, after an additional Health Care Request Form regarding knee pain. [Filing No. 39-3 at 38-40.] Mr. Bess stated that he needed an MRI. [Filing No. 39-3 at 38.] Nurse Willis asked Mr. Bess if he had been wearing his knee sleeve, and he advised that he was not wearing it. [Filing No. 39-3 at 39.] Nurse Willis instructed Mr. Bess "to follow provider orders and wear [the] knee brace at all times while up and moving around." [Filing No. 39-3 at 39.]

### C.    Discussion

#### 1.    *Claim Against Dr. Byrd*

Defendants concede for the purpose of their motion that Mr. Bess suffered from an objectively serious medical need but argue that Dr. Byrd is entitled to summary judgment because there is no evidence that Dr. Byrd acted with subjective deliberate indifference. [Filing No. 38 at 21-23.] They argue that the "evidence conclusively establishes that [Dr. Byrd] utilized professional medical judgment and did not exhibit deliberate indifference to any of [Mr. Bess's] medical needs," highlighting the x-ray and ultrasound results, the multiple assessments and provider visits, the medication and localized knee injection, the knee sleeve, and the physical therapy. [Filing No. 38 at 17-21.] Defendants assert that there is no evidence that Mr. Bess medically required any off-site referral and that "[w]hile [Mr. Bess] may have desired an MRI or an off-site referral, his individual desire is insufficient to establish medical necessity, or to establish that Dr. Byrd acted in some way that abandoned medical judgment." [Filing No. 38 at 22.]

Mr. Bess argues that Dr. Byrd continued to repeat the same ineffective treatment and that he requested an MRI on multiple occasions, to no avail. [Filing No. 50-1 at 2.] He asserts that Dr. Byrd acted with deliberate indifference by delaying treatment for sixty days from the date of his

9

injury, leaving him in serious pain, and by the delay between the time that Dr. Byrd ordered the localized knee injection and the time he received it. [Filing No. 50-1 at 6.]

In reply, Defendants reiterate that the evidence establishes that Dr. Byrd used professional medical judgment in ordering several courses of treatment and did not deliberately delay care. [Filing No. 52 at 2-3.] They highlight that Dr. Byrd ordered the first round of x-rays just days after Mr. Bess's injury, that they revealed no abnormality, and that he attempted to provide Mr. Bess with a knee brace but that it was not allowed by security staff. [Filing No. 52 at 3.] Defendants further highlight the medical notes from Mr. Bess's physical therapy sessions, which reveal that he achieved full range of motion, good strength, and was functionally dependent, and that when Mr. Bess continued thereafter to report pain, Dr. Byrd worked with him to provide additional treatments to address the pain, including ordering multiple forms of pain medication, additional x-rays, and an ultrasound, which revealed no significant abnormalities. [Filing No. 52 at 3.]

The Eighth Amendment "requires prisons to provide adequate medical care to prisoners." *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024) (citing *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)). "Because depriving a prisoner of medical care serves no valid penological purpose, deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (quotations omitted, citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Jackson*, 105 F.4th at 961.

"To prevail on a deliberate indifference claim, the plaintiff must prove (1) that he had an objectively serious medical condition (2) to which prison officials were 'deliberately, that is subjectively, indifferent.'" *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Johnson*, 5 F.4th at 824). The standard is not mere negligence—it requires proof that the defendant

10

knew of and disregarded an excessive risk of inmate health or safety or that they were aware of facts suggesting a substantial risk and consciously ignored it. *Riley*, 126 F.4th at 1295.

In the context of medical professionals, "the chosen treatment plan must 'represent[ ] so significant a departure from accepted professional standards or practices that it calls into question whether the [provider] actually was exercising . . . professional judgment.'" *Id.* (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). "In assessing a claim that a prisoner was subjected to such treatment, 'we look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs.'" *Riley*, 126 F.4th at 1295 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)). "Persisting with an ineffective course of treatment also can constitute deliberate indifference." *Riley*, 126 F.4th at 1296.

The Court limits its analysis to whether Mr. Bess has provided evidence that Dr. Byrd acted with subjective deliberate indifference, as Defendants have conceded that Mr. Bess had an objectively serious medical condition. Considering the totality of medical care that Mr. Bess received, no reasonable jury could conclude that Dr. Byrd violated the Eighth Amendment. The evidence establishes that Dr. Byrd ordered x-rays on August 13, 2020, just two days after Mr. Bess's injury on August 11, 2020. [Filing No. 39-3 at 46.] These x-rays were reviewed by Dr. Mehl, the outside provider who assisted with the x-rays, who reported that he found no fracture or dislocation, "[n]o acute bony abnormality," and only mild degenerative changes, along with the presence of postoperative changes from a prior ACL surgery. [Filing No. 39-3 at 1.] Dr. Byrd reviewed the x-rays and Dr. Mehl's report, and concluded "that it was more than likely that Mr. Bess did not have an acute tear, as the radiologist was able to note the existence of the prior reconstruction." [Filing No. 39-1 at 3.] The Court acknowledges that "[a]n x-ray will not typically reveal a torn ligament, such as an ACL or MCL," but that they remain a valuable diagnostic tool

11

that can reveal abnormalities that may be indicative of torn ligaments. [Filing No. 39-1 at 2-3.] Importantly, based on the x-rays, neither physician recommended an MRI or further investigation as they did not consider it medically necessary at the time. [*See* Filing No. 39-1 at 3; Filing No. 39-3 at 1.]

Additionally, the medical records indicate that Mr. Bess received ongoing care, including effective treatments in the form of a localized knee injection, physical therapy, and multiple pain medications, and also received a knee sleeve and additional imaging in the form of x-rays and an ultrasound, neither of which produced a recommendation for further imaging or an MRI. While the Court does not dismiss Mr. Bess's reports of continued pain, a reasonable jury could not conclude that Dr. Byrd was deliberately indifferent. There is no evidence of a departure from accepted medical standards or subjectively disregarding a substantial risk to Mr. Bess's health, and Mr. Bess's personal belief that he required an MRI is not sufficient to demonstrate a constitutional violation.

The Court **GRANTS** Defendants' Joint Motion for Summary Judgment, [Filing No. 37], as to Mr. Bess's Eighth Amendment claim of deliberate indifference against Dr. Byrd.

      2.     *Claim Against Centurion*

Defendants argue that Centurion is entitled to summary judgment because it cannot be vicariously liable for Dr. Byrd's actions. [Filing No. 38 at 23.] They assert that Mr. Bess sued Centurion only because it employs Dr. Byrd. [Filing No. 38 at 23.] They argue further that Mr. Bess "presents no evidence that a policy or custom of Centurion was the moving force behind" the alleged violations. [Filing No. 38 at 23.]

Mr. Bess asserts that his treatment was delayed on several occasions, that "he has adequately alleged that his injuries were traceable to Centurion['s] policies or custom[s]," and that

12

he suffered a constitutional deprivation as a result. [Filing No. 50-1 at 14 (citation omitted).]

In reply, Defendants argue that Mr. Bess "fails to describe any such policy or custom" for which Centurion would be liable and that although Mr. Bess mentions delays in treatment, he "does not claim that Centurion has a policy of delaying treatment or that the implementation of any of Centurion's policies has resulted in a constitutional violation." [Filing No. 52 at 4.] They reiterate that Centurion cannot be held vicariously liable for Dr. Byrd's actions. [Filing No. 52 at 4.]

"Private entities acting to fulfill government duties are not vicariously liable for the conduct of their employees." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 765 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978)); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("In other words, a municipality is liable under § 1983 only for *its own* violations of the federal Constitution and laws.") (emphasis in original, quotations and citations omitted). To succeed on a claim against a private entity acting to fulfill government duties, a plaintiff must show that the entity is directly liable by showing that the entity's official policy, widespread practice, or inaction caused the deprivation of the alleged constitutional right. *Stewart*, 14 F.4th at 765 (citations omitted); *Haro v. Porter Cnty., Ind.*, 129 F.4th 992, 996 (7th Cir. 2025) (citing *Monell*, 436 U.S. at 690-91); *Dean*, 18 F.4th at 235 (in the context of § 1983 entity liability, "[i]naction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'") (quoting *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2021)). The plaintiff must also show that the policy, practice, or inaction was deliberately indifferent to plaintiff's constitutional rights, which "is a high bar." *Dean*, 18 F.4th at 235 (citations and quotations omitted). In sum, a "plaintiff must show that [the entity's] action directly caused him to suffer a deprivation of a federal right, and that the [entity] took the

13

action with conscious disregard for the known or obvious risk of the deprivation." *Id.* at 236.

Mr. Bess's claim against Centurion fails for several reasons. First, Mr. Bess testified that he sued Centurion solely because it employed Dr. Byrd and he believed Centurion should be held responsible for Dr. Byrd's actions. [Filing No. 39-2 at 9.] However, as discussed above, the Court has concluded that, as a matter of law, Dr. Byrd did not violate Mr. Bess's constitutional rights. Without an underlying constitutional violation, Mr. Bess's claim fails. *See Dean*, 18 F.4th at 235.

Second, and more importantly, even if there were a constitutional violation by Dr. Byrd, Centurion could not be held vicariously liable under 42 U.S.C. § 1983 for Dr. Byrd's actions. *Stewart*, 14 F.4th at 765. A private entity acting under color of state law is only liable under § 1983 when the alleged constitutional deprivation was caused by a policy, practice, or custom of the entity. *Id.*

Third, Mr. Bess has presented no evidence that Centurion maintained any policy, practice, or custom that caused a constitutional violation. Further, to the extent he argues that Centurion maintained a policy, practice, or custom of delaying treatment, the record evidence is insufficient to support such a claim. The record reflects that Mr. Bess was seen by a nurse on the same day as his injury, that Dr. Byrd ordered initial x-rays two days later, that he was seen by nurses in a timely manner after submitting Health Care Request Forms, that Dr. Byrd quickly changed Mr. Bess's prescription pain medication after he requested a change, and that Mr. Bess received the second round of x-rays the day after they were ordered. While Mr. Bess did not receive the localized knee injection in a timely manner nor the ultrasound, these incidents appear isolated, and isolated incidents are insufficient to establish liability. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (finding that even three instances of delayed prescriptions were insufficient to establish a widespread unconstitutional practice, particularly when based solely on the plaintiff's own

14

experience); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (noting that *Monell* liability requires more than isolated incidents); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (finding that four incidents experienced only by plaintiff did not amount to a widespread practice).

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment, [Filing No. 37], as to Mr. Bess's Eighth Amendment claim against Centurion.

## II.
### MR. BESS'S MOTION TO APPOINT COUNSEL

Mr. Bess filed his Motion to Appoint Counsel after Defendants' Joint Motion for Summary Judgment became ripe. [Filing No. 53.] Because the Court has granted Defendants' Joint Motion for Summary Judgment in full, leaving no claims left in this case, Mr. Bess's Motion to Appoint Counsel, [Filing No. 53], is **DENIED AS MOOT**.

## III.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Joint Motion for Summary Judgment, [37], and **DENIES AS MOOT** Mr. Bess's Motion to Appoint Counsel, [53]. Final judgment shall issue accordingly.

Date: 5/30/2025

*Jane Magnus-Stinson* (signature)
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**

**Distribution via U.S. Mail:**

JAMAAR C. BESS
171820
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only